# HERSCHEL WOLPERT, INDIVIDUALLY AND d.b.a. SALES ENTERPRISES, v. CHARLES R. FOSTER AND ANOTHER.

254 N. W. 2d 348.

April 15, 1977—No. 46556.

*Nielsen, Blackburn & Merritt* and *Steven J. Tierney,* for appellants.

*Maslon, Kaplan, Edelman, Borman, Brand & McNulty* and *Charles Quaintance, Jr.,* for respondent.

Heard before Rogosheske, Kelly, and Todd, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendants appeal from a judgment of the Hennepin County District Court entitling plaintiff to recover damages arising from a contractual relationship with defendants. We affirm in part and reverse in part.

Plaintiff, Herschel Wolpert, was the sole proprietor of Sales Enterprises for the years in question, 1967 to 1970. The principal business of Sales Enterprises was the sale of fishing equipment to distributors and retail outlets. Defendant Charles R. Foster was the owner of defendant Strike Master, Inc., a concern whose principal business was the manufacture and sale of terminal fishing tackle and ice fishing equipment to wholesalers and major chain stores. Defendant[1] in 1967 was having financial difficulties and the parties worked out a two-part arrangement to aid him. The arrangement was intended to be temporary only, but no suitable permanent financing was discovered. The first part was a lending agreement, wherein defendant would assign his accounts receivable to plaintiff in exchange for a cash loan equalling an agreed percentage of the amount of the invoice. The second method of providing financial assistance is the focus of this appeal.

Defendant was having difficulty obtaining credit from suppliers. Plaintiff offered to use his cash or credit to purchase merchandise defendant desired; defendant, in turn, agreed to purchase those goods from plaintiff. The contract price was to be plaintiff's cost, plus a markup of 10 percent for domestic and 20 percent for foreign merchandise, unless otherwise agreed. Payment originally was intended to be in cash or merchandise,

---

[1] Hereinafter "defendant" refers as a matter of convenience to both defendants, unless otherwise noted.

but plaintiff gradually permitted defendant to make an increasing number of purchases from him on unsecured credit, on a so-called "open account." Plaintiff charged no interest on this account, because the markup charged defendant for the merchandise was in part to cover the cost of money and because the parties did not anticipate that large amounts of credit would be involved.

In 1969, however, the amount of credit extended to defendant on the open account had grown to $55,000. Plaintiff was also concerned because he discovered defendant had diverted some $32,000 in receipts from him in connection with the first part of the arrangement. Thus, in the fall of 1969, plaintiff advised defendant that if the parties were to continue to do business, plaintiff would charge defendant interest at the rate of 1 percent per month on the unpaid open account balance, commencing in January 1970. No agreement was reached, but defendant continued to deal with plaintiff through July 1970, when defendant arranged alternative financing.

On July 24, 1970, defendant terminated the arrangement. Plaintiff held inventory he had purchased for defendant at a cost of $19,055.08. He offered to sell it en masse to defendant at cost plus markup, but refused to permit defendant to purchase only the most desirable items. When the parties could not agree as to disposition of the inventory, plaintiff undertook to minimize his damages by selling or using it. Some of the inventory plaintiff used as components for his own products; some of it he sold in the regular course of his business or at cost or on a distress sale basis. The inventory consisted of thousands of items, disposed of in a multitude of transactions. By the time of trial he had reduced the inventory to items that he could not dispose of and that had a cost to him of $4,703.43, and had a contract price to defendant of $5,515.56. As of July 31, 1970, the open account had a principal balance of $21,817.50. By the time of trial, surplus monies received from the assigned account receivables reduced the balance to $12,886.59.

Plaintiff commenced the instant action in May 1971 to recover the principal and interest on the open account and the contract price for the remaining inventory. Sitting without a jury, the trial court found in plaintiff's favor. Defendant appeals from the judgment and challenges the award of interest and of the contract price for the remaining goods.

■ Plaintiff brought this action for the price of the remaining inventory under Minn. St. 336.2—709. That section provides in part:

"(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

\* \* \* \* \*

"(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

"(2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold."

Plaintiff holds the remaining goods for delivery to defendant upon payment of the contract price. Defendant concedes the goods have been identified to the contract and does not challenge the reasonableness of plaintiff's efforts to resell the remaining inventory. Instead, defendant contends that plaintiff has failed to adequately credit under § 336.2—709 (2) the part of the inventory that plaintiff was able to resell, because those resales did not comport with Minn. St. 336.2—706.[2] It should be noted that

---

[2] Section 336.2—706 provides in part: "(1) Under the conditions stated in section 336.2—703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made

plaintiff is not seeking damages with respect to that part of the inventory which has been resold. The trial court found that plaintiff "neither made nor lost any substantial amount of money" on the resales. Our perception of the evidence similarly reveals that the net proceeds from the resales were less than the contract price for those goods.

We find that § 336.2—709 does not incorporate the resale requirements of § 336.2—706. The Uniform Commercial Code makes it clear that a seller's remedies are cumulative. U. C. C. Comment 1, 21A M. S. A., § 336.2—703. A resale of goods conforming to the requirements of § 336.2—706 entitles a seller to damages measured by the resale price. Minn. St. 336.2—706(1). A resale failing to conform to these requirements may relegate the seller to measurement of his damages based on the market price at the time and place of tender. U. C. C. Comment 2, 21A M. S. A., § 336.2—706; Minn. St. 336.2—708(1); Miller v. Belk, 23 N. C. App. 1, 207 S. E. 2d 792 (1974). An action for the price arises in this situation only when reasonable resale efforts do

in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 336.2—710), but less expenses saved in consequence of the buyer's breach.

"(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the methods, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

"(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell."

Plaintiff failed to notify defendant of his intention to resell the goods and failed to identify the resales as referring to the broken contract.

not dispose of the goods.[3] It is a remedy distinct from an action for damages under § 336.2—706 or § 336.2—708, and thus we would hesitate to incorporate the requirements of § 336.2—706 with respect to the goods that have been sold as a prerequisite for maintaining an action under § 336.2—709 for the price of the remaining goods. Minn. St. 336.2—709 confirms our conclusion. It mandates crediting resale proceeds only of goods still held for the buyer at the time of suit and not of goods amenable to sale by reasonable efforts and for which no action for the price would lie. Minn. St. 336.2—709(2): "* * * The net proceeds of any *such* resale * * *". (Italics supplied.) Because the trial court found that plaintiff handled the resold goods in a commercially reasonable manner and because plaintiff's net proceeds from the resale were less than the contract price for the items, no factor appears in the instant case to alter our conclusion.[4]

In sum, plaintiff resold some of the goods identified to the contract but decided not to seek damages with respect to those goods. Instead, he sought to recover the contract price for the goods he could not resell. He has satisfied the requirements of § 336.2—709 and is entitled to the contract price, even though he failed to comply with the requirements § 336.2—706 imposes on an action to recover damages measured by the resale price. Thus, the trial court's judgment in this respect is affirmed, and defendant

---

[3] An action for the price also may be maintained where the goods are accepted by the buyer or where conforming goods are lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer. Minn. St. 336.2—709(1)(a).

[4] We intimate no opinion on the circumstances where a seller's resale of part of the goods nets him more than the contract price for those goods, and he then brings an action for the price of the remaining goods. We note in passing that Minn. St. 336.2—706(6) provides that "[t]he seller is not accountable to the buyer for any profit made on any resale," but that Minn. St. 336.1—106(1) provides that "[t]he remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed * * *." See, also, Akron Brick & Block Co. v. Moniz Engineering Co. Inc. 365 Mass. 92, 310 N. E. 2d 128 (1974).

is entitled to the goods in plaintiff's possession upon payment of the contract price.[5]

■ Defendant also challenges the amount of interest awarded by the trial court on the open account. It is well settled that an agreement to modify a written contract may be found in conduct on the part of the offeree, e. g., Mitchell v. Rende, 225 Minn. 145, 30 N. W. 2d 27 (1947), and the trial court's finding that an implied agreement to pay interest arose from defendant's continued dealings with plaintiff is not clearly erroneous. The rate of interest for which defendant is liable, however, is a more difficult question.

■ Plaintiff informed defendant that a condition of their continued contractual relationship would be an interest charge of 1 percent per month. No writing evidenced this rate. Defendant relies on Minn. St. 334.01, subd. 1, which requires:

*"The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing*; and no person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action, than $8 on $100 for one year; and, in the computation of interest upon any bond, note, or other instrument or agreement, interest shall not be compounded, but any contract to pay interest, not usurious, upon interest overdue, shall not be construed to be usury * * *." (Italics supplied.)

Defendant argues that the first clause limits his liability for interest to 6 percent since the modification of the contract was not in writing. Plaintiff responds that, since defendant Strike Master, Inc., is a corporation and since defendant Foster personally guaranteed Strike Master's obligations, Minn. St. 334.021 precludes defendant from interposing this statute. Dahmes v.

---

[5] The judgment of the lower court did not provide that defendant is entitled to the remaining goods upon payment of the contract price. It should be amended accordingly.

Industrial Credit Co. 261 Minn. 26, 110 N. W. 2d 484 (1961); Charmoll Fashions, Inc. v. Otto, 311 Minn. 213, 248 N. W. 2d 717 (1976). Minn. St. 334.021 provides in part: "No corporation shall hereafter interpose the defense of usury in any action." Thus, the determinative issue is whether defendant's raising of § 334.01 is a "defense of usury" within the meaning of § 334.021.[6]

We conclude that the requirement that interest charges different than 6 percent be in writing is not a usury defense. If an oral contract providing for more than 6 percent was usurious, it would be void under Minn. St. 334.03.[7] But the cases dealing with oral contracts for interest allow enforcement of the obligation up to the statutory rate, now 6 percent. Staughton v. Simpson, 72 Minn. 536, 75 N. W. 744 (1898); Swank v. G. N. Ry. Co. 63 Minn. 258, 65 N. W. 452 (1895). See, also, Allen v. Jones, 8

---

[6] Defendant advances another argument to reduce the amount of interest awarded, citing Bell v. Mendenhall, 78 Minn. 57, 80 N. W. 843 (1899), for the proposition that no interest is to be charged on an open account until the last item is debited and due and the amount thus liquidated. This proposition slightly misstates the case. In Mendenhall, the court dealt with two open accounts and held that an implied agreement to pay the legal rate of interest arose only from the date of the last *payment* on the account. The court stated:

"* * * It is probably the law that an account consisting of items of debit and credit is an unliquidated, running account, which will not carry interest, *without an agreement express or implied.* But, from the time of the last item on the debit side of such an account, it must be regarded as closed, and that there is an implied agreement to pay interest on the balance due thereafter." 78 Minn. 67, 80 N. W. 845. (Italics supplied.)

In any event, the case is inapposite here since an agreement to pay interest exists.

[7] See, also, Minn. St. 334.01, subd. 2: "A contract for the loan or forbearance of money, goods, or things in action, in the amount of $100,000 or more, shall be exempt from the provisions of this section and the interest for such an indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing. * * *"

"[T]he provisions of this section," arguably the usury provisions of § 334.01, must not include the provision here in question for it is reiterated.

Minn. 172 (202) (1863). This proposition was explicitly recognized in Blindman v. Industrial L. & T. Corp. 197 Minn. 93, 98, 266 N. W. 455, 457 (1936):

"The very first clause of [the predecessor to Minn. St. 334.01] seems applicable. It provides that the interest rate for any legal indebtedness shall be at the rate of $6 upon $100 per year, unless a different rate is contracted for in writing. Accordingly, this court held in Swank v. G. N. Ry. Co. 63 Minn. 258, 65 N. W. 452, and again in Staughton v. Simpson, 72 Minn. 536, 75 N. W. 744, that any oral promise or agreement for interest in excess of six percent per annum is invalid as to the excess. *These cases did not involve claims of usury, but the holdings are based on the provisions of* [the predecessor to Minn. St. 334.01]." (Italics supplied.)

The instant case differs from these cases in that here plaintiff attempted to charge a rate of interest (12 percent) greater than that allowed by law even if contracted for in writing (8 percent). This difference, however, does not blur the distinctions between the evidentiary writing requirement and the public policy judgment that 8 percent is the ceiling for fair interest rates.

It is true, as plaintiff argues, that courts liberally construe, as being restorative of the common law, statutes disqualifying corporations from raising a usury defense. Bichel Optical Lab., Inc. v. Marquette Nat. Bank of Mpls. 336 F. Supp. 1368, 1369 (D. Minn. 1971), affirmed, 487 F. 2d 906 (8 Cir. 1973); Annotation, 63 A. L. R. 2d 924. The fact that the provision in question lies within the usury statute does not alone render it a "defense of usury," even with a liberal construction of that phrase. Requiring a written contract for provision of more than 6 percent interest does not appear to fall within the relevant policy basis for the corporation disqualification statute, that "usury laws * * * increase the value of money and are restraints on the natural flow and supply of capital to the prejudice of industry and commerce." Carozza v. Federal Finance Co. 149 Md. 223, 250, 131 A. 332, 342 (1925). Therefore, the trial court erred in award-

ing plaintiff interest calculated at a 12-percent rate. Plaintiff is entitled to only 6-percent interest on the unpaid balance of the open account from January 1970. But for this modification, and the modification of the judgment to entitle defendant to the remaining goods upon payment of the contract price, the judgment of the trial court is affirmed.

Affirmed in part and reversed in part.